Good morning. Before we hear the first case, we have some admissions of my law clerks, which I'm going to move. So I'm going to turn this over to Judge Moore. We will entertain your motion, Judge. Thank you. I move the admission of my law clerks, Jeffrey Dawa Han, who is a member of the Bar and Good Standing of the Highest Court of Virginia, and Una Lee, who is a member of the Bar and Good Standing of the Highest Court of Virginia. I have knowledge of their credentials. I'm satisfied they possess the necessary qualifications, indeed exceptional qualifications, based on my year with them. So on that basis, I move their admission. What do you think, Judge Friedman? Why did you grant your motion, Judge? I agree. Let's grant the motion. Please administer the oath. Please raise your right hand. I swear and affirm that you report yourselves as attorneys and counsels of this court, unquietly and according to law, and that you support the Constitution of the United States of America. Thank you. Congratulations to us at the Bar and the United States of America. You've done exceptional work this year, and we hope to see you standing there at the podium sometime soon. The first case this morning is number 2009-1370, In re Chippendales, USA, Mr. Feingold. Not wearing a bow tie, huh? No. Stephen Feingold, Kirkpatrick-Stockton, for the applicant. May it please the court. Your Honor, we are here today to request that this court issue an order directing the Trademark Trial and Appeal Board issue a registration for Chippendales Cuffs and Collars uniform based on inherent distinctiveness. The decision to deny that registration was not supported by substantial evidence. Indeed, the TTAB ignored significant evidence throughout the case, throughout the record, documenting why there was an appropriate reason to grant this application. Before you get into the merits, I have a couple of preliminary questions. Yes, Your Honor. If you were to prevail in this appeal, we would then have outstanding two registrations covering the same mark for the same uses. Is that correct? No, Your Honor, that's not correct. The reason that's not correct is because the recitation of the existing registration and of the current application are not identical, and the Trademark Trial and Appeal Board, the examining attorney, accepted that this application is not... You have an existing registration, don't you? We have a registration covering, based on 2F, we have a registration covering exotic dancing for women. This application is for... Let me ask you a different question. Now, let's take this example in the back of the government's illustration of the proposed registration. Don't you now have a registration covering this mark? But not for the services for which this... Not for the services for which this application is filed. What are the different services? The difference in the services is, one, for live entertainment, and the existing registration is not covering live entertainment. And that was the basis on which the trademark examining attorney agreed. Basically, I take it basically what you're seeking to do here is to amend the earlier registration to place it on a different ground. Is that correct? Conceptually, that was the basis. Maybe, I don't know, perhaps the trademark office doesn't have any procedure to be able to accomplish that, so therefore you've been forced to... But if you prevail in this case will the mark that you get be non-contestable or still contestable for five years? The registration we would receive here would not be incontestable until five years had lapsed and an affidavit under section 15 were filed. Is the original registration in the record, in the drug appendix? What page is that at? The copy of the original certificate, your honor, is not in the record. So that's your question, I apologize. The copy of the original certificate is not in the record. And what's the description of services for the original registration? Exotic dancing for women, and this is for exotic dancing for women in the nature of live entertainment. Well, this would seem to be narrower than the original one. Correct, your honor. Well, that leads to Judge Friedman's concern. Your honor, I understand. This was the issue of whether or not there can be two duplicative applications. The issue of whether or not a 2F registration is duplicative to an inherently descriptive registration is one that has never been discussed. It is our contention, and I believe that the government's brief supports this position, is that those are not duplicative registrations, just as having the same mark on the supplemental registration. But aren't you basically complaining about the ground upon which the trademark office granted your first registration? That's correct, your honor. What? That's correct, your honor. And we've said a number of times in this court, when reviewing decisions of district courts, that we review the judgments, not the opinions. I'm wondering whether our jurisdiction here is limited to reviewing the basic decision of whether or not there should be any registration for this mark, rather than the particular grounds upon which they were granted the registration. That's what's bothering me about that. I've never, frankly, never seen a case in which someone has sought a second registration of the same mark, and I don't know whether there are any such cases before the trademark office. There may be, I don't know. Your honor, I'm not aware of there being any other such cases as well, but I would submit that the difference between a registration limited by Section 2F and a registration that is not so limited is a significant, substantial difference, and does not make them identical registrations. Well, it's significant in an infringement suit, because it's easier to prove infringement if you've got a mark that's inherently distinctive. Correct, your honor, which would be the same reason why a supplemental registration and a principal registration also are not considered duplicative, because one would be easier to enforce in a litigation context than the other, and the rights which flow from them are different, and therefore, since the rights which flow from a Section 2F registration and this registration are substantially different, therefore, they will not be duplicative. When your first registration was given to you, but on the ground of secondary meeting, could you have challenged that on the ground? It should have been placed on 2F instead? No, your honor, we were deprived of that opportunity. You couldn't challenge that? We could not challenge that. Why not? Because, your honor, the application, there was never a refusal, a final refusal. We submitted, we argued to the examining attorney that the mark was inherently descriptive, and in the alternative, we submitted 2F evidence, and specifically requested under the provisions of the TMEP that the examining attorney review the evidence of 2F only if he rejected the inherent distinctiveness, and that if he found against the inherent distinctiveness, that he issue a final refusal, which would give us the opportunity to appeal that decision or accept 2F registration. Instead, we received a notice of publication which does not indicate the basis of the registration, 2F or not, and therefore, we did not discover that the registration was under 2F until the certificate arrived in the mail, at which time we commenced a litigation based on the infringement of this mark. The trademark office advised us our only recourse was either to seek cancellation of this certificate of registration and have it remanded, which given the fact that there was a pending litigation on this registration, was obviously not a tenable position, or they suggested file a new application for the same mark and seek to have it registered as inherently distinctive. Wait, does that require a waiver of the of the PTO rules? As I understand it, normally you can't file for a second registration. They had to give you a waiver to do that? Well, they just, they believe that it would not be a duplicative. But was my statement correct, that to apply for a second registration, you had to have a waiver? No, we did not have to have a waiver. We did at one point seek a petition to the director, asking them to the extent that this was deemed to be a duplicative registration or application, asking the director to relieve us of that burden, because that is not a statutory requirement. That is a requirement of the trademark office for administrative convenience. And the director's office called us up and said that they had called the examining attorney, and the examining attorney has decided to accept our amendment to add them towards nature of live entertainment, and that way they would not need to reach the question of whether or not we could file, whether or not we needed to reach the petition that we had made. With my colleague's the PTO's fact-finding is not supported by substantial evidence. By the way, we'll give you an additional, we've consumed quite a bit of your time with this question, so we'll give you an additional five minutes. Thank you, your honor. So the, you're appealing the PTO's fact-finding as not supported by substantial evidence, whether or not the bow tie and cuffs were inherently distinctive at the time of the registration. And what about, I mean, Playboy bunnies? You know, the PTO cited them, the Playboy bunnies, apparently used the same cuffs and bow ties in advance of Chippendale's use of them, even, you know, predating them, and they are well known. Why should those not be enough to constitute the substantial evidence to support, I mean, we don't review DeNovo with substantial evidence. I understand. Why isn't that enough? That's not enough, your honor, for several reasons. First of all, the Playboy bunny costume is a bunny costume. It is not cuffs and collars. I've never seen a bunny with a bow tie or cuffs. No, but your honor, the predominant portion of that mark are the tail and the bunny ears, and that is what creates the, that is what, when you look up and think about the bunny costume, what immediately comes to your mind about the Playboy bunny are those aspects. The cuffs and collars are the minimus portion of that mark. It creates a completely different commercial impression when you have a bare-chested man wearing just cuffs and collars and having a bunny who happens to be wearing cuffs and collars. It also is for totally different goods and services. The Playboy bunny is a waitress. There is no evidence in the record that a Playboy bunny does striptease, and there's also no evidence in the record to support that providing male entertainment, entertainment for men, is the same target audience as providing... Well, actually, I think on that part, that part, you're not being entirely fair to the evidence of the record. I think that the evidence of the record suggested that Playboy bunnies and burlesque dancing and those sorts of things were, while maybe targeted at men, were things that were witnessed by both or enjoyed by both men and women, I guess, at the time. They were, Your Honor. But the fact that there may be some overlap does not address the fact that the atmosphere and the intent of the woman attending a Chippendale's performance is completely different than what they would be experiencing when they went to a Playboy club, and that their experience and what they would pay attention to as visual cues would be entirely different. And that is fundamentally in the record when we see articles presented by the trademark attorney that women and men's clubs are totally different in atmosphere. A woman's club is a very group atmosphere. It is a group event. It is an empowering event. A male strip club is a very solitary experience, and the nature... Is evidence of all of this in the record? Absolutely, Your Honor, and that is in articles attached to our expert affidavit that describe in detail the different experiences sociologically, from social science perspective, that what happens in these different venues. When you say, when you claim that your mark at the time you adopted it is inherently distinctive, I take it what that means basically is some female who might be interested in such programs seeing this mark would say, oh, that's a Chippendale production. Now, what is the evidence to support that? Apart from general evidence relating to difference between male and female strip shows, what is the evidence that ties your company to this particular mark? Your Honor, when someone attended the Chippendale show, they did not see an individual performer wearing the cuffs and collar. They saw the entire group of performers wearing the cuffs and collars, which makes it entirely different than when some strippers would come out wearing cowboys or Indian outfits. Everyone in the group is wearing this. The bartenders are wearing this. The wait staff is wearing this. Wait, wait. I thought there was not evidence in the record that the bartenders and wait staff were wearing this. Your Honor, that's what the majority said, but as the dissent notes, there is, in fact, evidence to that effect, and I would direct Your Honor to pages 323, 324, and 336 in the record, which the majority opinion simply overlooked and which the dissent points out are there. See, what's troubling me about it is that it seems to me that perhaps the bow tie tied around the neck and the cuffs would signify a male stripper, but does that signify that Chippendale is the one who is producing it? That's my problem. And Your Honor— And it's not enough to say that, well, for many years they've been doing it, there has to be something unique about this design that would symbolize when it was adopted that's Chippendale's. You're right, Your Honor. I agree. And the thing that that was, was that, first of all, this was a unique design. I'm confused. Is that statement correct? I thought that the whole notion of inherent distinctiveness is that if you had a unique mark, that it was assumed that it would serve as a source identifier. You didn't have to worry about whether the customer would actually view it as such. Well, I think, Your Honor, I think that if a consumer recognizes that this is a designation of a particular group, he doesn't need to identify which group it is. But in order to get a registration, you don't have to come in and show that consumers would identify this as a Chippendale's mark. That's secondary meaning, and it's clear that you don't have to have secondary meaning to have something be inherently distinctive, right? Correct, Your Honor. So the fact that it's a unique identifier, which is not descriptive, is inherently distinctive, and you don't have to show that the consumer would identify it with Chippendale's, right? Correct, Your Honor. That's correct. Okay, so... And here, the reason why this was perceived as a unique identifier was because it was used by the entire group. It was on promotional materials. It was also unique in the sense that it was not a symbol that had heretofore been used or recognizable in any context, and therefore... But the bunnies had it. But the bunnies, Your Honor, did not have it standing alone. It was part of an entire costume, like a tuxedo. But removing the garment so that all that's left is the skeleton, was it significant because it provided a space for the woman to put her own fantasy and her own context into the mark? And that's what was inviting, and that's what made this mark so significant to the audience, was because it was the skeleton of the tuxedo. It was not the complete item. And it was because of that aspect of it that it had such emotional force for the audience, and why it became such an icon so quickly. You agree, don't you, that whether a mark is inherently distinctive is a question of fact? Correct, Your Honor. I also believe that the fact that by 1983, unsolicited journalists were referring to this as the trademark signature of Chippendales in the blink of an eye. There's nothing in the record to indicate that there was voluminous advertising on television, magazines, but by the fact that in such a short period of time, there was already evidence in the news media referring to it that way indicates that it was immediately perceived that way by the audience. Maybe so, but that is getting into secondary meaning, and secondary meaning is irrelevant to inherent distinctiveness. What do you understand the point of the Seabrook test to be? That if something is not a unique identifier, if it's common in the business that someone shouldn't be able to appropriate it for purposes of registration, is that what the Seabrook test is designed to get at? Well, the Seabrook test is designed to... Yes, Your Honor, it's designed to make sure that people do not usurp common symbols and deprive the competitor... Just as you wouldn't be able to register something that was descriptive. Correct, Your Honor. And here, however, I would respectfully submit that the Seabrook test does not accomplish that goal. That in light of Walmart, the Seabrook test is no longer tenable because Walmart taught us that it was context which would tell us would a consumer almost automatically viewed something as inherently distinctive as a trademark. And the Seabrook test doesn't look to context but looks to the uniqueness of the design. Justice Scalia in Walmart spoke of the famous penguin-shaped cocktail shaker, which he said would not be inherently distinctive, but under the Seabrook test, it would be unique, it would be unusual, and it would therefore fall within the ambit, possibly, of Seabrook as being inherently distinctive. And I think that's why the Supreme Court did not accept the Walmart, the Seabrook test, for trying to use that as a way of applying it because it's not a workable test. And the evidence in this case indicates how untenable that position has been by virtue of the inconsistent ways which the Playboy Bunny advert has been and others. As a panel, we don't have the choice about applying the Seabrook test. So if you want to argue for a new test, you're going to have to ask for an invent. We're stuck with the Seabrook test, correct or incorrect or whatever. With all due respect, your honor, I believe that the fact that the Supreme Court issued Walmart frees you from the precedent because the Supreme Court is precedent over this court and a panel of this, the first panel to hear a case in which that issue is raised, if it believes that the state of the law is empowered and, I think, directed under the law to actually revisit the issue and make its own decision. Well, let's put that aside for a moment. Let's assume that we have to apply the Seabrook test. The question is, you know, how generic does the thing have to be? How common does it have to be? And that's what you're really arguing about. And you're saying that as a matter of law, this isn't common enough under the Seabrook test to be disqualified from being inherently distinctive. That's the issue. That's the issue, your honor. You're correct. And I believe that the cases that support our conclusion is the fact that the TTAB said that this was inspired by Chippendales, inspired by the Playboy Bunny. Inspiration is not related to whether or not a mark is inherently distinctive. In Ingray Framework, this court found that the use of a flashlight with respect to tire repair was an inherently distinctive mark, even though a flashlight is a common design when used outside of tire repair. And therefore, it was inspired by the flashlight, but that did not mean that the mark was not inherently descriptive. A similar situation happened in Ingray Playtech involving the use of an ice cream cone design with respect to baby pants. The fact that there arguably is, and I don't believe the record actually supports this, is the dissent says it's a slender read to rely on one statement in the record that was not discussed before the panel raised it in their opinion. But I believe that even if you accept that panel's finding on this issue, that inspiration does not have anything to do with whether or not a mark is inherently descriptive. And here, the record is voluminous as to the fact that this was a strong visual cue that is the result of a consumer focus group performed in 2002. There is replete with examples of non-lawyers, non-trademark experts referring to this mark as a trademark and recognizing it as a symbol of the company. And in addition to that, we have produced competent expert testimony at great length providing three distinct social science theories indicating why this mark would have functioned as a trademark in 1979. Well, your time has expired. You want to, we'll give you a couple minutes for rebuttal. Thank you, your honor. Thank you. And why don't we give the solicitor five additional minutes, if needed. May it please the court. This is an interesting case, but it's really not a complicated one. There is substantial evidence. What's the Seabrook test really getting at? Is the idea that it's to prevent people from appropriating common marks? Is that what the purpose of the Seabrook test is? Well, that's the purpose why we don't register terms or trade drafts that are not inherently distinctive. If it's descriptive, we require that they have to show that the public actually believes it's a source identifier. That's what Walmart's getting at. That's what Seabrook is getting at. Seabrook is not- The public believes it's a source identifier? I didn't understand that that was part of the inherent distinctiveness. You don't have to prove that the public would identify the particular mark with a particular source. It's presumed, right? That's the whole point of inherent distinctiveness. If by its intrinsic nature, is it going to be a source identifier or isn't it? Mr. Feingold brought up Walmart and Justice Scalia's example of the penguin shaker, which Justice Scalia said, that's not inherently distinctive. That's product design. It serves a purpose other than just source identification. Why? Because it makes the product more appealing. They took products outside of inherent distinctiveness. I mean, that's what the case is about. But the question is, what are we trying to get at with the Seabrook test? We're saying it's not fair for somebody to appropriate something which is a common mark in the business? Is that what the purpose of it is? I think that's probably the underlying policy, but it's trying to answer the question of if it's new or unusual, if it's something different, unexpected, well then consumers are going to be more predisposed to think of it as a source identifier than if it's something that they're used to seeing in that field. Is it just a mere refinement of existing ornamentation or dress that they're used to seeing as ornamentation or dress? And that's exactly what we have here. The one thing that's common to adult entertainment, be it by males for females, females for males, regardless of the gender of the audience, it's stripping, it's costumes, it's taking off clothes. I have a problem with that. I do think that there's a serious question about because of the Playboy bunny symbol, which was common, well known, as Judge Moore points out. But your theory that even apart from the Playboy bunny, the fact that costumes are used in adult entertainment somehow means that no costume can be inherently distinctive. That seems like a stretch. Our position isn't that no costume could be inherently distinctive, but you'd have to have something more than just the vestige of a tuxedo. Maybe if they had some unique wild C logo. You seem to admit that cuffs and collar for bank employees would be inherently distinctive. What's the difference that different costumes are used in adult entertainment so that because different costumes are used, no costume can be inherently distinctive? That seems kind of odd, doesn't it? No, the difference is what's expected and what's not. You walk into a bank, you don't expect to see a bare-chested man wearing cuffs and collar. That's out of place. That's unusual. That's not common expectation. You're going to walk into a bank and see that. So that does cause you to think, oh, wait, that's different. But when you walk into an adult entertainment theater, just like any other theater or performance, you expect to see costumes of some kind. And we can't do this inquiry in the abstract. You've got to look at what the services are, what the relevant marketplace is, what the context is. We agree with the context. It says, what's the expectation of the consumers in that marketplace? Is it commonplace or is it unique or unusual? And here, it's commonplace. We have over a century of evidence from early days of burlesque to modern times that show in the context of adult entertainment, you wear costumes and stripping, you take them off. And the tease part of striptease is there's a fantasy there. I have a problem with that. That really seems to be pretty broad because it seems to me that in any industry where it's common to have some sort of decor, that it doesn't become inherently distinctive. Under that theory, the two pesos restaurant decor wouldn't be inherently distinctive because restaurants commonly have different kinds of decor. I mean, I just don't understand how far that would go. Can I ask you a question that's very related? Would the PTO suggest that the bunny costume itself was not inherently distinctive when used even though it might have been used for stripping? Yes. Actually, that old registration, the original one that issued in 1964, was registered under Section 2F. As inherently distinctive? No. With their claim of acquired distinctiveness, not as inherently distinctive. So I'm just trying to say, no costumes. I mean, if a male stripper walked in with a giant fuzzy giraffe costume or something, I wouldn't expect that, right? I wouldn't then expect the giraffe to strip his clothing, I mean, or take off his costume. I mean, it just seems to me that the PTO might be going too far. I mean, perhaps costumes like this you're right about, maybe. But really absurd costumes, just like the absurdity of walking into a bank and seeing a bare-chested man, the absurdity of going to a strip bar and seeing, you know, a giant giraffe costume. Why wouldn't that be something that could be inherently distinctive? I think it could be, and that gets to the point that I really wanted to make, is you have to look at what we have here. These elements, this dress. You're not saying all costumes? No. Okay, so you're allowed, because that's where I thought you were going with Judge Dyke. I thought you were saying all costumes, because people expect costumes in stripping environments, all costumes, none of them could ever be inherently distinctive. I am not saying that none could ever be inherently distinctive. Was the board saying that? I don't think the board was saying that. It wouldn't be an unreasonable... It sounded as though it came pretty close to saying that. If they were saying that, and if we want to go that way, that's not unreasonable. The Supreme Court's guidance in trademark cases, it's telling us to restrict trademark, trade dress protection only to those instances where it's warranted. They took color out, they took product design out. Do you agree with your opponent's characterization of what the result would be if we were to reverse? I mean, are there two registrations, do they merge into each other or what? Has there ever been a case, as far as you know, where the trademark office has permitted two registrations to be outstanding for the same mark? We are not aware of a case like this, no. I am aware of instances where two registrations would be permitted for the same mark, where there are some different services involved. The differences in the basis upon which it was authorized? I'm assuming that the mark is the same. Obviously, if there are differences in the mark, or the mark is being used for different products, that would be a quite different case. But as I understand, basically, this mark is the same and used on the same services, that is, male strippers. And I'm wondering if the board has ever authorized a dual registration for the same mark for the same services. I am not aware of that before the board, through which they could come in now and said, we want to change the basis upon which you authorized the mark previously. No, there is not, because that would be reopening prosecution in the other registration. The only way you could do that is to cancel the registration, ask for it to go back to examination. But here, they say they didn't get the chance to make this argument, and the office exercised its discretion to let them do so now. And it's a very unique... Let them do so now in the sense, you gave them a waiver so they could apply for a second registration? What's the procedure? There wasn't a procedure of that nature. They changed the identification of services and made the argument that this basis is different, and that makes these two different. And we do agree that there is a difference in not the rights that you get between an incontestable registration under 2F and one that doesn't have that 2F notation, but there is a difference in what you can do with that registration outside of the office. So the 2F notation does add some burden when you go to enforce it theoretically on the strength of the mark factor. So there is some 2F notation or not on the face of the registration. And we exercise our discretion to let them make that argument here. Now, I'd like to go back to the point about, are we trying to say all costumes would never be inherently distinctive? It's very rare that you have absolutes in trademark law, and so I'm not saying that. Perhaps your giraffe example, Judge Moore, would be something outrageous and absurd. What we're saying is that this trade dress, this Cuffs and Collar, doesn't get you there. Let's assume hypothetically that there had never been the Playboy Bunny, that there never been the use of a Cuffs and Collar motif in adult entertainment before. Would your position be that this was not inherently distinctive? Yes. Why? Because all of the evidence from the burlesque era supports that conclusion, and what just the general expectation... What evidence from the burlesque era? There's evidence that burlesque dancers wore all types of different costumes, including formal wear. Yeah, but no evidence that they wore bow ties and cuffs or dinner jackets, right? Well... Isn't that correct? That there isn't any evidence to that effect? There is evidence. It's arguably not in the book, which we point to, to explain why she couldn't have been saying what they say she was saying, that no one before had ever done this. She cabins her declaration very carefully to say no one targeted to female audiences specifically, but she has an example in her book of a woman wearing little more than a Cuffs and Collar, so she couldn't have been saying across the board no one had ever done that, right? That's true, but... We can't pay attention to that. And I'm not asking you to. What I'm asking you to look at is the overall evidence in the record here. But the question is, let's assume that there wasn't any Cuffs and Collar use in adult entertainment. Forget about the Playboy bunny. Let's assume that there wasn't any example of that. Why is this then within Seabrook? Why is the fact that the other costumes used in adult entertainment sufficient to render this not inherently distinctive? Seabrook doesn't tell you that you have to have this exact design used to have it be common or unusual or not unusual. That's never the test. You can be the first and only one to use a word mark. That doesn't mean that you're protectable. You can be just as here, even if we assume they are the first and only one to use a Cuffs and Collar. That does not mean source identification significance. That's not the law. And so it doesn't matter that... Is it similar enough to the other things such that consumers would not say, oh, that's inherently distinctive. That must be a special place. I'm not sure I'm understanding your question. Is it similar enough? You're talking about it doesn't have to be the exact same thing. So I would think that your argument would be the Cuffs and Collar are similar enough to other sorts of costumes that people would expect. And it doesn't even have to rely on the tuxedo. It's just they would... Shells of costumes are what our burlesque dancers use. I would think that would be your argument. Is that not your argument? That is our argument. It's similar enough. It's similar enough. People would see this and not think of it as That is exactly our argument. Yes. And that's what Seabrook tests you to answer. May I come back to something in the first registration? As I understand it, they argued both inherently distinctive and secondary meaning. Is that right? They did. And what did the office say about that? Did it say that it decides the secondary meaning and they therefore don't have to decide the primary meaning point? Or did they say something else? Why did they only place their decision on the ground of secondary meaning? Did they reject in any way the contention that it was inherently distinctive? Or did they say they didn't have to reach that? They did reject the contention that it was... They did reject it. Yes. And they accepted the alternative to F argument. But in its decision in this case, that wasn't the basis of the board's decision. The board could have said, I suppose, we decided this in the previous decision and that's the end of it. You can't come back a second time and say, okay, we now have some better evidence that we'd like you to consider. But they didn't put it on that ground. They did not. And again, this is very unique. At the time the TMEP did not have the clear guidance that it now has to examining attorneys when applicants plead in the alternative. The examining attorney always has to consider the arguments that the applicant makes. But if there was an assertion in the alternative of inherent distinctiveness and the applicant also indicated it was willing to have the examining attorney consider the registrability under section 2F, then the examining attorney would do that. And that's what happened in the prior registration. The examining attorney didn't agree with the arguments that it was inherently distinctive, but accepted the 2F evidence and passed it to publication. Now, if that happens... Yeah. What's the guideline now? Now, if that happens, the examining attorney has to explicitly notify the applicant as to what it's doing and give them the option to either appeal the underlying refusal of non-distinctiveness or drop that and accept the 2F amendment. If it's not clear that the applicant is clearly agreeing to an amendment under section 2F, the examining attorney now has to contact them and make a note to the file that says the applicant agreed or they want us to maintain the underlying refusal so that they can appeal it to the board. And I think that's really the only reason why we're here. It's... We... Yeah. The examining attorney, the office exercised discretion to allow them to make this argument in this case. Something else is not clear to me from the statements in the briefs. If I come in and allege that my mark is inherently distinctive, that's all I say. I don't present any supporting evidence. Does that shift the burden to the examining attorney to prove that it's not inherently distinctive or do I have to come up with something more than that in order to shift the burden? You have to come up with something more than that. The examining attorney has to merely establish a reasonable predicate. As this court said in Pacer Tech, it's not that we have to establish this actually is out there in the marketplace. We have to establish a reasonable predicate based on the evidence that's available to us. Before there's any burden on the examining attorney to prove that it's not inherently distinctive. No, that is the proof that it's not inherently distinctive. We established a reasonable predicate it's not inherently distinctive and here the modern evidence and the burlesque evidence establishes that because remember we're determining registrability at the time they come in for the application and here we have this unique again unique circumstance where they waited over well 25 years for this application to come in and there's it's the evidence is clouded by all their evidence of acquired distinctiveness here no one disputes that it's a trademark. Someone claiming that a mark is inherently distinctive at the outset has to in effect make out a prima facie case. Yes, the applicant then we establish why we don't think it is inherently distinctive. And then at that point the examining attorney says no it isn't inherently distinctive because. No, at that point as I understand it the the applicant has to come in and they're in the best position to do so with evidence as to inherent distinctiveness. In Pacer Tech merely arguing that the design patents weren't actually in the marketplace without putting in evidence to show that wasn't enough and and at that point you know the examining attorney considers that evidence and either agrees or disagrees that it shows inherent distinctiveness and that's what happened here and it went up to the board. The board considered all the evidence didn't find their evidence probative. Their evidence that they're referring to about all of the the costumes and how the waiters wore it that's not in the record for at the time of adoption. That's all post 79. What's the relevant date for making the inherent distinctiveness determination? Is it the date of first use or is it the date of the application or the date of the action on the application? What is it? It is while the application is pending up until the board makes its decision. That's what Thunderbird. The point of the point of decision about registrability. Yes, yes and. And what tells us that that's the right date? Thunderbird products does. That's the Cathedral Hall case where the applicant had come in in 1963. The evidence changed by 1965. The court said it's not the application date. It's while the again trademark rights aren't static. We have a little bit of the reverse situation here where this is not a case where there's any evidence that it's become generic or lost trademark significance. The evidence shows it has acquired trademark significance but it doesn't show that immediately upon first encounter in 1979 that consumers would have viewed this as a source identifier and that's. Now I'm confused. You target you say you're asking a question about 1979 instead of the date of the application date of the proceeding. Which is it? The date the application is pending the modern evidence shows that it's extremely common for people. So why are you talking about 1979? I the only reason I'm doing that is that the board decided to talk about 1979. So whenever you look at it and we were meant to look at it as of today and the modern evidence shows that it is extremely common in the adult entertainment industry and particularly in for male strippers to don various costumes and leave vestiges on their body to prolong the fantasy just as costumes were important. Just as it's common for restaurants to don particular decor right? I mean I don't know where how far you go on that. Well the costume is intended to provoke. Why doesn't carry over to a restaurant? Restaurants have decor. So any decor must be inherently or not not inherently distinctive. No that's not true. Only certain decor is inherently distinctive. It's got to be the right combination of elements. We don't have the right combination of elements here. Now I would like to just address a couple of other points. I think your your time has expired so. Oh I'm sorry. I just counting up. Okay well thank you very much. Your honor is very briefly. You have two minutes. Very briefly your honor. I think you're correct Judge Dyke with respect to the reasonable predicate here and I would refer you to a case that I but which is very directly on point. In re Mark Lynette's 2007 Westlaw 333-6399 with the examining attorney argued that the trade dress for beer cans that consisted of nothing more than ordinary shapes and designs on the beer can could never be inherently distinctive and the TTAB said the examining attorney's arguing because drink cans commonly have designs covering their entire surface. Any designs covering the entire surface of a drink can is a mere refinement of that practice and they rejected that as being an adequate predicate as a reasonable predicate and the same argument here is there was never a reasonable predicate provided to support the refusal of the registration and if there were a reasonable predicate we presented substantial evidence to overcome that because the evidence we showed was the context of a group of dancers all wearing the same costume so it wasn't a costume it was a uniform and just as the Dallas cheerleaders all wore the same uniform or with respect to a clown in the in the cases cited in our brief or Taco Cabana with the Supreme Court noted that the restaurant decor included the costumes of the service workers in the restaurant or in the Marlboro man having been found to be inherently distinctive trademark even though it's just a cowboy there are those cases show that when the consumer has an expectation because it's out of the ordinary and seeing men dressed with nothing but cuffs and coat bow ties is out of the ordinary and seeing all of the people they're doing that and even if it wasn't the bartenders and the wait staff it was certainly all of the performers which is in a different experience than what happened in burlesque with individual dancers came up into different things an individual dancer doing something is not the same as a group and the group experience is what would tell the consumer this is something that means Chippendales it just doesn't mean a costume. I think your two minutes is up. Thank you. Thank you. I think both counsel the case is submitted.